## HIGGINBOTHAM v. INTERNATIONAL TRUST CO.

(Supreme Court, Appellate Division, First Department.    December 30, 1910.)

1. CORPORATIONS (§ 408*)—SUBSCRIPTIONS FOR STOCK—AUTHORITY OF PRESIDENT TO RECEIVE PAYMENTS.

The president of a corporation has authority to receive payment of subscriptions for its stock, though the corporation is a trust company, which cannot transact business until all its capital stock is paid in.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1678; Dec. Dig. § 408.*]

2. CORPORATIONS (§ 408*)—AUTHORITY OF PRESIDENT—RECEIVING PAYMENTS OF SUBSCRIPTIONS TO STOCK.

As subscriptions to its stock are assets of the corporation upon which it can sue, the president binds the corporation in receiving payments of subscriptions and in issuing receipts agreeing to exchange them for engraved certificates when prepared, and, such officer having received money from a subscriber after the entire authorized capital stock had been allotted and issued a receipt, the corporation was bound thereby, and was liable to the subscriber for the amount so paid.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1678; Dec. Dig. § 408.*]

3. CORPORATIONS (§ 426*)—UNAUTHORIZED ACTS OF OFFICERS—RECEPTION OF BENEFIT.

It appearing that the corporation did not have the necessary amount of its capital stock paid in, so as to entitle it to begin business, and that the president, to make up the difference, procured a cashier's check from a bank of which he was also president, payable to the order of the corporation, so that it could procure the certificate of the superintendent of banks enabling it to commence business, and that, to keep his account straight, the cashier of the president's bank at the president's direction

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

charged the amount of the check to a depositor's account, and subsequently the president transferred to such depositor's account money paid him by subscribers to the corporation's stock which included plaintiff's subscription, the corporation must be deemed to have received the benefit of plaintiff's subscription, since the corporation was liable for the money taken from the depositor's account by the president which liability was discharged in part with plaintiff's money.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1596, 1702–1704, 1708, 1710, 1716; Dec. Dig. § 426.*]

Ingraham, P. J., and Scott, J.. dissenting.

Appeal from Trial Term, New York County.

Action by E. Gaston Higginbotham against the International Trust Company. From a judgment for defendant, and an order denying a new trial, plaintiff appeals. Reversed, and new trial granted.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, MILLER, and DOWLING, JJ.

George C. Austin, for appellant.

Eugene A. Philbin, for respondent.

MILLER, J.   The action is for money had and received; the claim being that the defendant accepted and retained $5,000 of the plaintiff's money in payment of a subscription for 25 shares of its stock after the entire authorized capital stock had been allotted. The certificate of incorporation of the defendant was filed in the office of the superintendent of banks on the 25th day of March, 1907. On the 26th day of September, 1907, the first meeting of its board of directors was held, at which one Howard Maxwell was elected president. He had theretofore acted as chairman of the incorporators. On the 27th day of September, Maxwell, as president, and Bouker, as secretary, verified an affidavit stating who the officers and stockholders of the defendant were, but not including the plaintiff's name in the list of stockholders, and another affidavit that the whole amount of the capital stock had been in good faith subscribed and paid in in cash. The defendant was organized with a capital and surplus of $1,000,000. On the 30th of September a bank examiner certified that the books of the Oriental Bank showed a credit to the defendant of $1,000,000, the amount of its capital and surplus, and thereupon the superintendent of banks issued his certificate, authorizing the defendant to transact business. The plaintiff had subscribed for 25 shares of stock. The date of the subscription does not appear, as the subscription agreement is not dated. But it was made on one of the regular forms, and is No. 25, from which it may be inferred that it had been signed prior to the 26th day of September for the receipt book; which was the only record kept by Maxwell, either as chairman of the incorporators or as president of the defendant, showing the payments of subscriptions, indicates that there were at least 44 subscriptions prior to September 27th. It may be said in passing that that book is not a record of the subscriptions to stock, as is asserted in the brief of the learned counsel for the respondent, but is a record of the receipts of payments of subscrip-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tions. That record shows that on October 2d $1,000,000 had been paid in. Thereafter Maxwell received the payments of four subscriptions, including the plaintiff's, made October 15, 1907. The subscription agreement contained this provision:

"I hereby authorize Howard Maxwell, as attorney for me, to enter upon the proper subscription book my subscription for said shares, or for any shares that may be allotted me in the event of over subscription."

The plaintiff paid his subscription by a check payable to the order of "Howard Maxwell, Chairman," and in return received the following receipt:

"International Trust Company, Broadway and Fulton Street.

"New York, Oct. 15, 1907.

· "Received of E. G. Higginbotham five thousand dollars in full payment for twenty-five shares of stock of the International Trust Company.

"This receipt will be exchangeable, on surrender, for engraved certificate when same are completed.          Howard Maxwell,

"International Trust Co.,

"President."

The words "Chairman Organization Com.," after his signature, were stricken out, and the word "President" written in by said Maxwell. While, no doubt, the subscription agreement constituted Maxwell the agent of the subscriber to enter his subscription, the receipt purports to have been the receipt of the defendant, and the agreement to exchange engraved certificate for the receipt purports to be the agreement of the defendant. The question, then, is whether Maxwell had actual or apparent authority to bind the defendant. It seems to me that the president of a corporation has authority to receive the payment of subscriptions for its stock, even though the corporation is a trust company which cannot transact business until all its capital stock is paid in. The defendant's board of directors had met and elected officers, as they obviously had to do before the affidavits could be made, upon which the certificate of the superintendent of banks could issue. While the officers had no authority actually to transact business before obtaining said certificate, they did have authority to take the steps necessary to obtain the certificate, one of which was the receipt of payments of subscriptions. It cannot be doubted that the president had authority to issue the stock certificates. If so, it seems to follow that he had authority to issue the substitutes for the engraved certificates pending the preparation of them. There is no claim that the plaintiff knew when he paid his subscription that the entire amount of the defendant's capital and surplus had been paid in, or even that the certificate, authorizing the defendant to do business, had then been issued. He denied such knowledge in his complaint, but apparently forgot to do it on the trial. However, the mere receipt of payments of subscriptions to the entire amount of the authorized capital stock and surplus would not necessarily preclude the receipt of other payments, because the subscription agreement contemplated that, in case of oversubscription, there should be an allotment.

Subscriptions to stock are assets of the corporation, and there can be no doubt that a corporation can maintain actions to recover such sub-

scriptions.  It must follow that in receiving payments of subscriptions and in issuing receipts, agreeing to exchange them for engraved certificates when prepared, the president has authority to, and does, bind the corporation.  Maxwell was the plaintiff's agent to enter his subscription upon the subscription books of the company; but he was the defendant's agent to receive payment of subscriptions, and to issue therefor the defendant's receipts, exchangeable for engraved certificates of stock.

However, the plaintiff did not rest upon the receipt alone, but proved that the defendant got the benefit of his subscription.  On the morning of the 30th of September the defendant still lacked $145,000 of having the necessary $1,000,000 to its credit in the Oriental Bank.  The respondent suggests that that shortage included Maxwell's subscription of $125,000.  But the only evidence in the record with respect to his subscription is the receipt book which shows that it was paid September 27th.  In order to get the necessary $145,000 which was lacking, Gow, one of the defendant's directors, requested the cashier of the Borough Bank of Brooklyn, of which Maxwell was president, to send a cashier's check for that amount.  The cashier communicated with Maxwell who authorized that to be done, and thereupon drew a cashier's check for $145,000, payable to the order of the defendant, which was deposited by the defendant in the Oriental Bank, and thereby the defendant was enabled to procure the certificate of the superintendent of banks, enabling it to commence business.  To keep his accounts straight, the said cashier upon the direction of Maxwell charged $145,000 to the account of a depositor, and credited that amount to the cashier's account.  Maxwell, as chairman, kept an account in the Borough Bank in which he deposited certain moneys paid him by the subscribers to the defendant's stock.  On the 10th of October there was a credit to that account of $105,000, and on that date the cashier, at his direction, transferred $105,000 of that amount to the credit of the account from which the $145,000 had been taken, and on the 16th of October the further sum of $12,000, which included the plaintiff's $5,000, was likewise transferred.  Thus $117,000 of the money misappropriated to enable the defendant to begin business was repaid from the money collected by Maxwell from subscribers, including the plaintiff.  It seems to me that the case is precisely the same as though the said $117,000 had in the first instance been deposited in the Oriental Bank to the credit of the defendant.  It is of no consequence that the identical money collected on the plaintiff's check did not reach the defendant.  The money which was first stolen went into the defendant's treasury, and the defendant received the benefit of it.  If that theft had not been made good, the defendant could have been compelled to repay the sum stolen.  Maxwell repaid it by using $117,000 of the money received by him in payment for subscriptions to the defendant's stock.  How the other $28,000 was refunded is now of no consequence.  Thus the defendant's liability was discharged in part with the plaintiff's money, and it seems to me that it is refining altogether too much to say that the defendant did not have the benefit of that money.  If it had in fact gone directly into the defendant's treasury, the case would be plain.

126 N.Y.S.—24

That was the result of the transaction if regard be had to substance rather than form.

The judgment and order should be reversed, and a new trial granted, with costs to appellant to abide the event.

CLARKE and DOWLING, JJ., concur.

INGRAHAM, P. J. (dissenting). I dissent. It appeared from the testimony that certain individuals, of whom the plaintiff was one, constituted themselves a committee to organize a trust company under the laws of the state of New York, that one Howard Maxwell was constituted the chairman of that committee, and that as such he was authorized to receive subscriptions to the capital stock of the company, which was to consist of 5,000 shares of the par value of $100 each, and each subscriber was to pay $200 per share for the stock, so that the trust company would start business with a capital of $500,000 and a surplus of $500,000. Subscription blanks were prepared, by which each subscriber subscribed for the number of shares of stock stated, for which he agreed to pay $200 per share, and such subscription agreement authorized "Howard Maxwell, as attorney for me, to enter upon the proper subscription book my subscription for said shares, or for any shares that may be allotted to me in the event of over subscription." There was a book containing a record of these subscriptions showing the number of each subscription, its date, the number of shares subscribed, and the amount paid by each subscriber. This book was produced and introduced in evidence by the plaintiff. On the 20th of March, 1907, a certificate of organization had been executed which contained the names of those organizing themselves together for the purpose of forming a trust company under the laws of the state of New York, and the corporation was organized by the election of Maxwell as president and one Bouker as secretary. After the execution of this instrument, these subscriptions to the stock were obtained. The first seems to have been obtained on August 29, 1907, and by September 27, 1907, the whole amount of capital stock was subscribed, when the company applied to the superintendent of banks of the state of New York for the certificate required to entitle it to transact business. Maxwell and Bouker verified and filed an affidavit to which was annexed a true and correct list of the stockholders of the defendants, with the post-office address and the number of shares of stock held by each of them, respectively. From that list it appears that Maxwell had subscribed for 625 shares, and that other individuals named had subscribed for shares of stock, completing the amount of capital provided for by the articles of incorporation. The plaintiff was not named as an incorporator or a stockholder. This list of stockholders seems to contain the names of those whose names were entered in this book as having subscribed for this stock of the company on or prior to September 27, 1907, but included none of the stock subscribed for after that date. On the same day, September 27, 1907, Maxwell, as president, and Bouker, as secretary, of the defendant, also verified an affidavit which stated that the capital stock of the said corporation

was the sum of $500,000 and was divided into 5,000 shares of $100 each; that the amount of the said capital stock, to wit, the sum of $500,000, has been in good faith subscribed to and paid in cash. These affidavits and the list of subscribers were submitted to the superintendent, who, on the 1st of October, 1907, issued a certificate authorizing the persons named who had organized the corporation to transact the business of the trust company under the title of the "International Trust Company," with a capital stock of $500,000, in accordance with the said certificate of organization and the laws of this state, and on that day, October 1, 1907, the defendant actually commenced to transact business under the certificate of incorporation. Thus, upon the completion of the subscription of capital stock of the corporation authorized by this certificate of incorporation, and the actual payment of the amount of subscription in cash, all of the capital stock authorized was actually issued and the subscribers became the stockholders of the corporation.

Whatever authority this committee had to receive subscriptions then clearly terminated. Neither the corporation nor the committee could receive further subscriptions after the amount of the authorized capital stock had all been subscribed; but, as the capital stock had all been subscribed before the formal authorization to do business, it seems to me that no act of this committee who had been organized to obtain subscriptions to the stock could bind the corporation as to subscriptions subsequently obtained after the stock had all been subscribed and had been paid for to the corporation. The subscription to the stock was complete. The stock had been subscribed. The amount called for by the subscription had been actually paid in in cash, and was on deposit to the credit of the corporation, and the corporation had started to do business under its charter as an actual existing corporation. There is no dispute but that the subscription for the capital stock had been actually paid in by the 1st day of October, and the plaintiff had then, so far as appears, neither subscribed to the stock, nor actually paid any money to either the corporation or to the committee.

It appeared from the evidence that prior to the 1st day of October the amount paid upon these various subscriptions had not equaled the amount that was required by the sum of $145,000, and that on that day, to make that amount good, Maxwell, who was the president of the Borough Bank, had directed the cashier of that bank to send to him a cashier's check for $145,000 to make good the subscription. Just whose subscriptions this was designed to make good does not appear from the record, but Maxwell himself had subscribed for 625 shares for which he was required to pay $125,000. To justify this appropriation of the bank's money, he directed the cashier to charge the cashier's check to an account in that bank in the name of one Carrie M. McGuire to which there was a credit of an amount exceeding $145,000. That this was an embezzlement of the money of the bank, or the McGuire account, may be conceded; but by the payment of this $145,000 the subscription to the stock of the defendant corporation was complete. The $1,000,000 required by the subscription was

deposited in a bank to the credit of the defendant, and it was upon this deposit that the defendant was authorized to transact business by the superintendent of banks. To make this McGuire account good, Maxwell transferred to its credit the various sums of money that he had received as subscriptions to its capital stock, and other moneys which he procured, so that eventually this account was restored to the condition in which it was before the cashier's check was given and charged up against it. After the 1st of October, when the defendant was authorized to transact business and when its subscriptions to the capital stock were complete, Maxwell apparently received further subscriptions to stock. One of those was the plaintiff's who subscribed for 25 shares of stock, and on October 15, 1907, he paid to Maxwell $5,000, and received from Maxwell a receipt for $5,000 in full payment of 25 shares of stock of the International Trust Company. That receipt was signed, "Howard Maxwell, International Trust Company, President." The plaintiff also signed the usual form of subscription, whereby he subscribed for 25 shares of the stock of this company. By it he agreed to pay $200 a share, making a total of $5,000, and by it he authorized "Howard Maxwell, as attorney for me, to enter upon the proper subscription book my subscription for said shares, or for any shares that may be allotted to me in the event of over subscription."

This subscription is undated, but, according to the book introduced by the plaintiff, it appears that it was the last one received, and was entered in the book as of the date of October 5, 1907. So far as appears from the evidence and from the entries in this subscription book, the subscription of the plaintiff and the payment of the $5,000, the amount required by his subscription, were all received upon the same day October 15, 1907. It is not contended that the defendant ever directly received any part of this $5,000. The money was paid to Maxwell as chairman, and was clearly received by Maxwell as chairman of the committee to receive subscriptions, and not on behalf of the bank. It was a void subscription on its face, because all of the stock of the bank had been subscribed. The record of the subscriptions which had completed all authorized capital stock had been filed with the banking department, and the bank was actually transacting business which it could not do until the stock had been subscribed in full and the subscriptions paid in. It is conceded that the subscription was void, and the action is based upon the fact that it was a void subscription, and the plaintiff is suing for money had and received. To hold the defendant liable, it must appear that the defendant had actually received the plaintiff's money. This, as I view it, the evidence conclusively disproves. The defendant never received a dollar of the plaintiff's money, and received no possible benefit from the payment of the money to Maxwell as chairman on October 15, 1907. That Maxwell had swindled the plaintiff may be conceded, but for Maxwell's embezzlements or frauds the defendant was not responsible. It is sought to hold the defendant liable because of the fact that Maxwell used the money that he received from the defendant to make good his embezzlements of the money of the Borough Bank of which he

was president which was occasioned by his applying the funds of the Borough Bank to make good his or other subscriptions of the defendant's stock to the corporation; but it seems to me to be perfectly clear that this imposed no liability upon the defendant. Maxwell had applied the money of the Borough Bank to the payment of his or other subscriptions to the capital stock of the defendant. After the subscriptions were made and the money actually paid in to complete them, the Borough Bank could not have recovered the money so paid from the defendant because of Maxwell's embezzlement, and the fact that Maxwell had subsequently received the plaintiff's money, had deposited it in the Borough Bank to his own credit, and subsequently charged his account and credited the McGuire account to make good the charge that he had made on the books of his bank against that account did not make it a transaction with which this defendant had anything to do, or for which the defendant was in any way responsible. Maxwell himself, however, had subscribed 625 shares of the defendant corporation. As chairman of this committee, Maxwell had issued to the defendant a receipt for $5,000 which he was to apply upon the subscription which the plaintiff had authorized Maxwell to make on his behalf. That the plaintiff had a cause of action against Maxwell, either to recover back the $5,000 or to compel Maxwell to transfer to the plaintiff 25 shares of the stock for which Maxwell had subscribed is conceded; but as there could be no further subscription to the defendant's stock, as it was fully subscribed and issued, and as the defendant had never authorized Maxwell, or anyone else, to accept further subscriptions of its stock, it seems to me that the plaintiff's remedy was against Maxwell and not against the defendant.

At the end of the case the plaintiff asked for the direction of a verdict, which the court denied. The defendant then moved to dismiss the complaint, which motion the court granted. There was no request to submit any question to the jury, and therefore all questions of fact were resolved in favor of the defendant.

I think it clear upon this evidence that the court was right in refusing to direct a verdict for the plaintiff, and it was not error to direct a verdict for the defendant so that the judgment should be affirmed.

SCOTT, J., concurs.